# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARY ROBERTS, and** | : | **No. 3:07cv1406** |
| **GAIL ROBERTS,** | : | |
| **Plaintiffs** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **FIRST BANK OF DELAWARE,** | : | |
| **HFC MORTGAGE COMPANY,** | : | |
| **DIANE B. ROWLAND,** | : | |
| **LEHMAN BROTHERS FSB,** | : | |
| **BLS FUNDING CORP.,** | : | |
| **RENAISSANCE APPRAISAL GROUP,** | : | |
| **HOMEQ SERVICING,** | : | |
| **WMC MORTGAGE CORP.,** | : | |
| **MORTGAGE ELECTRONIC** | : | |
| **REGISTRATIONS SYSTEMS, INC.,** | : | |
| **WACHOVIA MORTGAGE** | : | |
| **CORPORATION,** | : | |
| **WELLS FARGO BANK, and** | : | |
| **FAIRBANKS CAPITAL GROUP,** | : | |
| **Defendants** | : | |

## MEMORANDUM

_____Before the court are defendants' motions to dismiss (Docs. 21, 26, 27, 30, 31, 33, 39, 44, 78, 89, 98) the instant complaint.  Having been fully briefed and argued, the matters are ripe for disposition.

**Background**

       This case arises out of mortgages made by the plaintiffs.  Plaintiffs contend that defendants engaged in a conspiracy to attract first-time home buyers to the Pocono

Mountain region of Pennsylvania.  Defendants would then sign these inexperienced purchasers to inflated mortgages.  Plaintiffs are residents of Bushkill, Pennsylvania. (Complaint (hereinafter "Complt." at ¶ 1)).  Several of the defendants are banks and mortgage servicing agencies involved in financing the plaintiff's purchase of land and a contract to construct a new home on that property.  (Id.).  Defendant Diane Rowland, who resides in Saylorsburg in Monroe County, is a real-estate appraiser licensed in Pennsylvania.  (Id. at ¶ 8).  Defendant Fairbanks Capital Financing is now doing business under the name Select Portfolio Servicing (SPS).  (Id. at ¶ 20). Defendant Wells Fargo is included as a trustee for a brokerage-company-established pooled investment fund. (Id. at ¶ 25).

Plaintiffs allege that Raymond LaVigne, formerly a defendant in the case, controlled a series of companies that worked to solicit first-time home purchasers from the New York and New Jersey metropolitan areas to buy homes in the Poconos.  (Id. at ¶ 29).  The companies placed advertisements in printed real estate publications, as well as on an on-line website.  (Id.).

Plaintiffs allege that these advertisements were fraudulent and deceptive. (Id.).  They were designed to procure customers for new home construction in the Bushkill, Pennsylvania, area.  (Id.).  Agents would show the prospective customer a plan for the property or a picture of it.  (Id.).  Those agents would then drive those customers through various developments.  (Id.).  After this tour, agents would show prospective buyers financing documents, asking the customers if their rent in New

2

York exceeded the mortgage payments on the property they had toured.  (Id.).  The figures cited in this sales pitch included only the payment on principal and interest of the mortgage, and did not include real estate taxes, home maintenance assessments, mortgage insurance, utilities, maintenance and other costs.  (Id.).  Agents promised defendants that they would receive an allowance to help pay closing costs and fees if they entered into a purchase agreement.  (Id.).

Defendants allegedly targeted "naive and unsophisticated" first-time home buyers.  (Id.).  Agents informed these buyers that they would qualify for mortgages, that they would not need an attorney to represent them in the transaction, and that they would be happy in the new home.  (Id.).  The agent also promised that defendants' offices would take care of the entire transaction and ensure that the newly constructed home would be completed.  (Id.).

Plaintiffs were first-time home buyers.  (Id. at ¶ 30).  They were attracted to the properties offered by the defendants by advertising in newspapers, websites and magazines in northeastern Pennsylvania.  (Id.).  They had not attempted to purchase a home in Pennsylvania before seeing this material.  (Id.).  Plaintiffs viewed several variations of a model home and received promotional materials comparing costs of a home in the Poconos with rent in the New York metropolitan region.  (Id. at ¶ 31).  They received a contract for sale with the seller listed as Silver Creek, Inc.  (Id.).  This contract was for real estate with no home on it.  (Id. at ¶ 32).  The plaintiffs also received a contract from Silver Creek for the construction of a home on the property.

3

(Id.).  The contract for purchase of land was for $184,100 and the contract for the construction of the home was for $167,100.  (Id.).  Plaintiffs apparently signed these contracts.  (Id.).  They also allege that LaVigne's representative promised to reimburse plaintiffs $6,000 when the home was completed.  (Id. at ¶ 33).

The agent then directed plaintiffs to contact Defendant HFC Mortgage to arrange for a mortgage.  (Id. at ¶ 34).  Plaintiff alleges that HFC's practice was to have the buyer sign the credit application and all documents supporting it in blank.  (Id. at ¶ 35).  HFC would then procure an appraiser, and the two parties would conspire to make sure that the appraised value of the property was equal to or greater than the contract price between LaVigne and the purchaser.  (Id. at ¶ 36).  HFC would then contact a mortgage bank, preventing the purchaser from having an opportunity to secure their own mortgage.  (Id. at ¶ 37).  HFC would also find a title servicing company.  (Id. at ¶ 38).  HFC or a settlement agent then prepared the paperwork necessary for the customer and conduct a closing on the property.  (Id. at ¶ 39).  The title company selected by HFC would serve as settlement agent at the time of the closing.  (Id. at ¶ 40).

In addition, plaintiffs contend that they were not told the actual price and interest rate they would pay for either the construction loan or the permanent mortgage they later signed before actually attending both those closings.  (Id. at ¶ 61).  They were also never told of the true amount taxes they would be required at either their mortgage closing or the closing of their construction loan.  (Id. at ¶ 62).

4

The taxes they paid on this property far exceeded the taxes they would have had to pay for similar property in New York City.  (Id. at ¶ 63).  Defendants knew that plaintiffs could not afford the home with the taxes included, but pressed ahead with the agreement, since they were concerned only with selling the property, constructing the home, securing the mortgage and the fees associated with it, and then selling the loan to another bank.  (Id. at ¶ 64).

First Bank and Lehman received defective paperwork from HFC and BLS on the loans, including pages that were blank and unsigned, and paperwork that was not provided at all.  (Id. at ¶ 65).  The appraisal of the property was also "patently defective."  (Id.).  First Bank and Lehman did not perform due diligence in evaluating the credit application, and did not evaluate the papers supplied by defendants, did not procure any income tax returns from IRS or do any basic examination to determine whether the loan was a safe one.  (Id.).

Plaintiffs allege that the defendants knew of plaintiffs' inability to afford the property, but were unconcerned because they hoped only to profit from the sale of the property, construction of the home and the fees related to executing the mortgage.  (Id. at ¶ 64).  Defendants First Bank and Lehman thus provided a mortgage for the original closing and a later refinancing without regard to plaintiffs' creditworthiness.  (Id. at ¶ 66).  Because of the fraud allegedly perpetrated by the defendants and the appraiser, plaintiff's mortgage exceeded the actual mortgage value of the property and did not take into account plaintiffs' ability to repay the loan.

(Id. at ¶ 69).

Plaintiffs also allege that the value of the home as represented in the contracts for sale and construction exceeded the market value of the home at the closing. (Id. at ¶ 68). Plaintiffs closed on their loan with Defendant Lehman on December 13, 2002. (Id. at ¶ 73).  Though they had been informed in a disclosure statement in August 2002, that the loan was to be a conventional, fixed-rate one, the loan at the closing was an adjustable-rate loan with a much higher initial interest rate. (Id. at ¶¶ 70-71, 74-77).  Plaintiffs reviewed the documents related to this December 2002 loan after the closing and noticed that the amounts due on the loans were different than those contained in plaintiffs' records. (Id. at ¶ 87).  Plaintiffs requested an explanation from LaVigne, but never received one. (Id. at ¶ 88).

Unable to meet their obligations under the existing loan, plaintiffs sought to refinance their mortgage through Defendant BLS in 2003. (Id. at ¶ 89).  BLS arranged for plaintiffs to secure a loan through Defendant WMC. (Id. at ¶ 91).  This value of this new mortgage was more than $200,000, and the interest rate exceeded 9%. (Id. at ¶ 92).  Plaintiffs executed this mortgage on July 23, 2003. (Id. at ¶ 93). On September 9, 2003, WMC informed plaintiffs that their mortgage would now be serviced Defendant HomeEq. (Id. at ¶ 95).  In the same month, WMC also informed plaintiffs that their mortgage had been transferred to Defendant Wachovia. (Id. at ¶ 96).

Plaintiffs could not meet the obligations on their new mortgage and were

6

informed by letter from HomeEq in March 2004 that they were delinquent.  (Id. at ¶¶ 97-98).  They applied for help on their mortgage through Pennsylvania's Homeowners' Emergency Mortgage Assistance Program (HEMAP), but were denied.  (Id. at ¶ 99).  Mortgage foreclosure proceedings commenced in the Court of Common Pleas of Monroe County in August 2004.  (Id. at ¶ 100).  Plaintiffs had applied for Chapter 7 bankruptcy protection in July 2004.  (Id. at ¶ 101).  They received a discharge in October 2004.  (Id. at ¶ 101).  Plaintiffs did not include any claims pursuant to RICO or related to the instant complaint in their bankruptcy estate.  (See Bankruptcy Petition, Exh. A to Defendant Lehman Brothers' Brief in Support of Motion to Dismiss (Doc. 50)).

Plaintiffs then sought mediation from the State Banking Commission, contending that they had been victims of predatory lending.  (Complt. at ¶ 103).  They also filed a complaint with the Pennsylvania Attorney General's office.  (Id. at ¶ 104).  Eventually, a person from the Attorney General's Office informed plaintiffs that the mediation program faced difficulties processing their claim because the lending institutions involved were uncooperative.  (Id. at ¶ 105).  The plaintiffs have since filed a complaint with the Pennsylvania Human Relations Commission. (Id. at ¶ 110).

In July 2005, after intervention from the Attorney General's Office, HomeEq agreed to stay foreclosure on the property.  (Id. at ¶¶ 106-107).  HomeEq informed plaintiffs from July to November of that year that investors were considering repurchasing the property.  (Id. at ¶ 108).  In January 2006, however, HomeEq

informed plaintiffs that such repurchase had been denied.  (Id. at ¶ 109).  Instead,

plaintiffs were to pay arrears of around $41,000 or foreclosure would recommence.

(Id.).  Defendant Wells Fargo currently owns the mortgage, and has commenced a

foreclosure action against defendants.  (Id. at ¶¶ 111-12).

Plaintiffs brought a seven-count complaint on August 1, 2007 (Doc. 1).  Count

I alleges a conspiracy pursuant to the Racketeer-Influenced and Corrupt

Organizations (RICO) Act, , among all of the defendants.  Plaintiffs allege that

defendants created a criminal enterprise designed to defraud consumers in real

estate transactions, the affairs of which were conducted solely by LaVigne.  The acts

comprising the conspiracy included filing of false documents related to mortgage

financing and committed fraud in securing mortgages.  Count II alleges a RICO claim

against Defendants First Bank and Lehman Brothers.  The count alleges that First

Bank and Lehman brothers conspired with LaVigne, HFC and BLS to create a

fraudulent scheme for financing construction of plaintiff's home.  Count III alleges a

RICO claim against Rowland and Renaissance Appraisal.  These appraisers

allegedly inflated the value of the house in order to assist the other defendants in

securing mortgages on the property.  Count IV brings RICO charges against

Defendants WMC Mortgage, BLS, Mortgage Electronic Registration Systems, Inc.,

Wachovia Mortgage Corporation, Fairbanks Capital Corp., Homeq Servicing and

Wells Fargo Bank.  Plaintiffs allege that these companies, involved in the refinance

of their mortgage, engaged in a conspiracy to force this refinance and profit from it.

Count V alleges a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, against the "LaVigne defendants," which include the dismissed Raymond LaVigne and Silver Creek, Inc.  The defendants allegedly made material misrepresentations about the value of the property plaintiffs bought and the cost of their mortgage, which led to the plaintiffs' loss of their property and their inability to sell the home to satisfy the mortgage.  Count VI also raises a count under the Pennsylvania Consumer Protection Law based on the LaVigne Defendants' alleged violation of federal law.  Defendants' advertisements were allegedly misleading because they failed to disclose the terms of repayment. Count VII alleges violations under the Consumer Protection Law because the LaVigne defendants utilized a bait-and-switch tactic in their advertising.  The advertising did not actually reflected the home that plaintiffs could buy or the terms under which they could do so.

Plaintiffs filed this complaint pro se, though they have subsequently obtained representation.[1]  Plaintiffs served the complaint on most of the defendants, but never served Raymond LaVigne or Silver Creek.  The court eventually dismissed those parties (Doc. 84) and denied a motion by the plaintiffs to reconsider this order (Doc. 88).  All of the remaining defendants eventually filed motions to dismiss.  The parties then briefed those motions, bringing the case to its present posture.

**Jurisdiction**

---

[1]The attorney retained by the plaintiffs never filed an amended complaint.

Because this case is brought pursuant to the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, the court has jurisdiction

pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all

civil actions arising under the Constitution, laws, or treaties of the United States.").

The court has jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. §

1367(a) ("In any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so

related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article II of the United States Constitution.").

**Legal Standard**

When analyzing a 12(b)(6) motion to dismiss, all well-pleaded allegations of

the complainant must be viewed as true and in the light most favorable to the non-

movant to determine whether "under any reasonable reading of the pleadings, the

plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663,

665-666 (3d Cir. 1988) (citing Estate of Bailey by Oare v. County of York, 768 F.3d

503, 506 (3d Cir. 1985), (quoting Helstoski v. Goldstein, 552 F.2d 564, 565 (3d Cir.

1977) (per curiam)). The court may also consider "matters of public record, orders,

exhibits attached to the complaint and items appearing in the record of the case."

Oshiver v. Levin Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir.

1994)(citations omitted).  The court need not accept legal conclusions or

unwarranted factual inferences. See Curay-Cramer v. Ursuline Acad. of Wilmington,

Del., Inc., 450 F.3d 130, 133 (3d Cir. 2006) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)).  The complaint is properly dismissed "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Haines v. Kerner, 404 U.S. 519, 520-521 (1972)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

**Discussion**

All of the defendants have filed motions to dismiss.  Most of those motions raise the same grounds for dismissing the complaint.[2]  As the court finds one argument dispositive of the matter for all defendants, the court will address only that issue.

Several of the defendants argue that since plaintiffs had gone through bankruptcy and knew of their RICO claims when the bankruptcy occurred, failure to include those RICO claims in the bankruptcy estate means that plaintiffs lack standing to assert those claims in the instant action.  Defendants further argue that plaintiffs cannot make use of the doctrine of fraudulent concealment to rescue these claims, because plaintiff has not alleged any acts by defendants to conceal those claims.  In addition, defendants contend, the filings about which plaintiff complains were public documents and could not have been concealed.

---

[2]Plaintiffs' counsel filed a separate, largely duplicative, brief in opposition to each motion to dismiss.  The court reminds plaintiffs' counsel that efficiency could be achieved and expense in litigation spared by responding in one brief to all the arguments that are duplicate in defendants' motions.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37 (1976).  Standing provides "justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." Warth v. Seldin, 422 U.S. 490, 498 (1975).  The Supreme Court has held that "the standing question in its Art. III aspect  is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" Id. at 38 (quoting Warth, 422 U.S. at 498-99 (1975)).  The Court has described three elements that comprise the "irreducable constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A plaintiff must first "have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized [citations omitted] and (b) 'actual or imminent, not 'conjectural or hypothetical.'" Id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).  Next, the injury suffered by the plaintiff must by causally connected to the conduct of which the plaintiff complains:  "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" Id. (quoting Simon, 426 U.S. at 41-42.  Finally, "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. (quoting Id. at 38, 43).  A plaintiff who

12

lacks standing cannot bring a lawsuit.

Here, defendants argue that plaintiffs lack standing because any RICO claims they possessed passed from their hands when they filed for bankruptcy.  A bankruptcy estate consists of, *inter alia*, "all legal and equitable interests of the Debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1). "Congress intended a broad range of property to be included in the estate."  U.S. v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983).  Courts have found that legal claims which accrued before the filing of the bankruptcy petition are included in the estate. See, e.g., Cain v. Hyatt, 101 B.R. 440, 441-42 (E.D. Pa. 1989) (finding that "[c]ourts have uniformly held that the broad scope of § 541 encompasses causes of action existing at the time of the commencement of the bankruptcy action.") (cited with approval in Banks v. County of Allegheny, 223 Fed. Appx. 149, 151 (3d Cir. 2007); (holding that "it is well established that the 'interests of the debtor in property' include 'causes of action.'") (quoting Gochenour v. Cleveland Terminals Building Co., 118 F.2d 89, 93 (6th Cir. 1941)).  Such claims are part of the bankruptcy estate because creditors are entitled to them if they have monetary value.  See, e.g., Krank v. Utica Mut. Ins. Co., 109 B.R. 668, 669 (E.D. Pa. 1990); Wilson v. Parisi, No. 04cv1737, 2007 WL 914167 *2 (M.D. Pa. March 26, 2007).  Accordingly, to the extent that plaintiffs' RICO claims existed at the time of the bankruptcy filing, they were part of the bankruptcy estate.

Bankruptcy law also provides that once the bankruptcy is filed, the bankruptcy

13

trustee "is the representative of the estate [and] has the capacity to sue and be sued."  11 U.S.C. § 323(a-b).  The trustee, not the debtor, has the authority to bring any legal claims which are part of the estate.  See, e.g. Bailey v. Household Fin. Copr. III, 306 B.R. 391, 394 (D. D.C. 2004) (finding that "a debtor in a chapter 7 case under the Bankruptcy Code violates § 362(a)(3) when she continues prosecution of litigation initiated prepetition, or when she commences litigation postpetition of a prepetition claim, if the claim pursued is property of the estate.").  Thus, only the bankruptcy trustee has standing to pursue causes of action that existed at the time of the bankruptcy filing, and "the debtor no longer has standing to pursue a cause of action which accrued at the time the Chapter 7 petition was filed."  Anderson v. Acme Markets, Inc., 287 B.R. 624, 628 (E.D. Pa. 2002).   The question before the court, then, is whether the plaintiff's RICO claims accrued before plaintiffs filed their bankruptcy petition.

The court finds that plaintiffs' RICO claims existed at the time they filed for bankruptcy.  A RICO claim accrues "'when the plaintiffs knew or should have known of their injury' . . . [and] the source of their injury."  Prudential Ins. Co. v. U.S. Gypsum Co., 359 F.3d 226, 233 (3d Cir. 2004) (quoting Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000)).  The plaintiffs knew of their injury when they realized that they could not afford to pay the mortgage they made.  Since the inflated mortgage was their injury, the maker of the mortgage was the source of the injury. Plaintiffs knew or should have known the source of the injury as soon as they made

the mortgage; any transfer of that mortgage to other banks and lenders should also have been known by the plaintiffs, since they were notified of the transfers. Accordingly, plaintiffs had to have known of their injury and its source before the bankruptcy filing.  The RICO claims were ripe.  Because the RICO claims were part of the bankruptcy estate, plaintiffs lack standing to bring them before this court.[3]

Plaintiffs do not necessarily dispute that they would not have standing to pursue their claims if the existed at the time they filed their bankruptcy petition.  They attempt to save their claim, however, by employing the doctrine of fraudulent concealment to argue that they could not have been aware of their claims at the time they brought the bankruptcy petition and the claims therefore had not accrued at that time.  Fraudulent concealment equitably tolls a statute of limitations in cases where the defendants acted to prevent plaintiff from discovering the existence of a cause of action.  To establish fraudulent concealment, a plaintiff must show: "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action."  In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.3d 1144, 1178-79 (3d Cir. 1993).  The plaintiff bears to "burden of proving fraudulent concealment," and "must show active *misleading* by the defendant" and that "he exercised reasonable diligence in attempting to uncover the relevant facts."  Forbes, 228 F.3d at 486-87 (emphasis in

---

[3]Because plaintiffs never listed the claim as an asset, they also cannot claim that the trustee abandoned the claim and seek to bring it in this lawsuit.  See Krank, 109 B.R. at 669.

original).  Here, the plaintiff alleges no facts which indicate that any of the

defendants attempted to disguise their role in making the mortgages in question.

Indeed, the defendants are the companies who made and processed plaintiffs'

mortgages, and who negotiated with plaintiffs and informed them of their

involvement.  Plaintiffs do not deny that they knew the identities of the parties who

made and serviced their mortgages.  Plaintiffs cannot, therefore, use the doctrine of

fraudulent to rescue their claims.  The court will grant the defendants' motions.

**Conclusion**

Because the plaintiffs' RICO claims had accrued at the time they filed for

bankruptcy, plaintiffs no longer have standing to bring them before this court.  The court

will grant defendants' motions to dismiss the complaint.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARY ROBERTS, and** | : | **No. 3:07cv1406** |
| **GAIL ROBERTS,** | : | |
| **Plaintiffs** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **FIRST BANK OF DELAWARE,** | : | |
| **HFC MORTGAGE COMPANY,** | : | |
| **DIANE B. ROWLAND,** | : | |
| **LEHMAN BROTHERS FSB,** | : | |
| **BLS FUNDING CORP.,** | : | |
| **RENAISSANCE APPRAISAL GROUP,** | : | |
| **HOMEQ SERVICING,** | : | |
| **WMC MORTGAGE CORP.,** | : | |
| **MORTGAGE ELECTRONIC** | : | |
| **REGISTRATIONS SYSTEMS, INC.,** | : | |
| **WACHOVIA MORTGAGE** | : | |
| **CORPORATION,** | : | |
| **WELLS FARGO BANK, and** | : | |
| **FAIRBANKS CAPITAL GROUP,** | : | |
| **Defendants** | : | |

## ORDER

_____**AND NOW**, to wit, this 19th day of September 2008, the defendants' motions to dismiss the plaintiffs' complaint (Docs. 21, 26, 27, 30, 31, 33, 39, 44, 78, 89, 98) are hereby **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

BY THE COURT:


s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court